Good morning, Your Honors. My name is Megan Misko, and may it please the Court, I am here on behalf of David Randle and his suit against Crosby Tugs. At issue in this case, at the end of the day, this appeal is about a single question, and it's whether or not the employer of a seaman has fulfilled its duty to provide prompt and adequate medical care to a severely injured seaman by simply calling 911. What would you have had them do? Call 911. There's not a question of whether or not the ambulance is going to come. Ask what is happening to their seaman. Ask what the medic who is in the medical report says, he's unresponsive, he is unable to sit up, he has to be restrained, it appears that he's having a stroke. Where are you taking our employee? Is it a stroke center? Is it just the closest place? A single question of whether, where you're taking him, and then follow through with someone else at the company, or at least follow through, maybe follow him to the hospital. I'm not asking you to do that. The problem is that there was, allegedly, a mistake made by the doctors. These guys running a tug, are they supposed to know more than the doctors? They're supposed to go, well, no, I think he had a stroke, and not a this or that, and you should run this test. I mean, this is highly specialized issue. This isn't something where they operated on the wrong leg and anybody would know that. So what I'm just struggling with, I understand the broad reach of maritime kind of Jones Act scenarios. I'm just having trouble getting my head around how you avoid this if you are Crosby. I think the way you avoid it is, and I understand the difficulty with the maritime issue, there is a little bit more protection for these seamen than there is for an average worker at a workplace. No, I get that, but it should be that if you're doing everything right, you avoid liability. It shouldn't be that you're just liable, I understand the maintenance and cure issue, that's not what I'm talking about, but that you're just liable for the world that happens to the seamen. Or is that the law? I mean, if that's the law, it's the law, but that just sounds very, I know it's broad, but that sounds way, way broad. And I'm not suggesting that in every single case, calling 911 is not appropriate, but I think in this specific situation, that is the law. That if Crosby had, instead of calling 911, they had said, you know, let's not wait for the ambulance to get here, we don't know when they'll get here, let's take him to this hospital, they would have been responsible. I don't think there's really a question that they would have been responsible. I think the fact that they just called an intermediary shouldn't leave them of that responsibility. But is there something on its face that tells us this is an inappropriate place to take him? I think that there are stroke certified centers in the state of Louisiana and all over the nation, and I don't, and I think that is part of why my understanding of also our neurologists' discussion and what has happened is I think there are, you know, the Tesh Regional Medical Center where he was taken, they had to do what is a telemedicine consult. They had to get somebody outside of the hospital to say, you know, this is what's going on, and what is happening, what should we do? Do we even know that there is a hospital that has the right facilities within a certain amount of miles? Is that in the record? That is not in the record, no, Your Honor. Okay, so there may not be a close enough place that's better. Well, I think that had we been able to present this before the jury, I think there is, that could have been part of the record. Well, but that's not how this works. I mean, you have to create a record that we look at, and if there's evidence that right next door was this stupendous, wonderful hospital and you took him to the wrong one, that should be in the record if that's part of the argument. I mean, my concern is the doctors couldn't agree, really, on what to do with Mr. Randall, and you're saying Crosby should have known what to do. I mean, that's essentially what you're saying. They should have asked, how's he doing, whatever. I mean, if I were, say, a family member of this guy, and I'm going along on the ambulance or whatever, and everybody's doing what seems right, they're rushing him here, doctors are reviewing him, things are happening, I'm thinking everything's fine. If the doctors are saying, we don't know if it's this, we don't know if it's that, how am I supposed to interject that? And I'm a well-educated person. I'm not sure everybody running around in this world dealing with ships has a graduate degree. But it doesn't matter, because I don't have a graduate degree in medicine any more than they do. And I understand that. So I'm just struggling with, I realize, again, this is very broad, I realize protection of y'all are presenting this as a roasting over question in our circuit, so obviously the degree of the breadth is at issue. And so I'm pushing on the idea of, this is what you're supposed to do is call 911. If they sat around instead trying to find a Wi-Fi so they could get on their phone and find the best hospital within 300 miles and all that, you would have said you delayed his care. You shouldn't have been delaying his care. You should have let the caregivers decide that. You should have let doctors decide that. I think with the established law in the circuit with the DeSentineau case and the Central Gulf case, an employer can be vicariously liable for the medical negligence of a provider. And even in the DeSentineau case, they just said, hey, ship agent, take him to a doctor. I doubt very seriously that the ship agent or the ship provider in that case knew or would have been able to also second guess the doctor who provided the care to that particular seaman in that case. I don't think that's what the law requires. You're asking us, though, to take it one more further than those cases. And I think those cases are already quite broad and quite positive for the seaman. And that's fine. Again, I should we go that one step further when the thing you're supposed to do? If somebody right now started collapsing, I would call 911 or I'd find a phone where I could call 911. That would be my response. It wouldn't be, hmm, I wonder if we should call this center or that center and I wonder which hospital in Houston might be best and let me call my friend who knows stuff about hospitals. It would be calling 911. And that's what we want people to do. What is it that you want these tug operators and whatnot, what the Crosbys of the world, to do that would have changed the outcome here? I think that the calling of 911 is what their policy was. I think that asking and making sure that he was taken to a facility that they could trust or that they knew of or at least that they were following along, this is not a much further step than what happened in DeSentineau and Central Gulf. Even in the Dice case that both Crosby and the District Court relied on, the Fourth Circuit case, Dice v. Express Marine, in that case they called 911 and there was a policy. In that case, the Fourth Circuit said that's a close call as to whether or not 911 in that particular instance was fulfilling their duty for prompt and adequate medical care. And in that case, the seaman was not incapacitated, had not suffered a stroke. I think that the specifics of this case and what had happened to him, I think following along a little bit more closely than just calling 911 and washing their hands of it, I think that, again, it is a broad duty that they have, that prompt and adequate. And it wasn't adequate. It's unfortunate that that's the way that Crosby doesn't want to have to be responsible for that, but that's the way that the law reads under the Fifth Circuit cases already is the prompt and adequate. And I don't think that But why isn't calling 911 prompt and adequate? It is prompt. It's not guaranteeing. If the ambulance, if the medics had come out, it's not a guarantee of prompt and adequate. That's the problem is it's just a call of 911. If the medics had come out and not given adequate care on the rig or on the tug, Crosby would have been responsible, but they wouldn't have been able to second guess in that situation either because they don't have a medic on board. I think that the problem is just calling 911 I don't think guarantees a seaman to what he is entitled, which is prompt and adequate medical care. Was this seaman, he was conscious? He was conscious, but he was unable to speak. He had a left side paralysis and He was conscious, but he couldn't speak. Yes, he had to He was not in any condition to make the decisions for himself about the adequacy of the ultimate providers. No, Your Honor. He couldn't even sign the authorization form in the medic record, which is in the record. It says he can't sign. They had to even give him over from the ambulance to the hospital. The only way he was able to even get anybody's attention that he had suffered the stroke was by, he had fallen to the ground, he was kicking at the door with his right leg. He wasn't able to speak and he had no, it was left side of paralysis. So the question is whether the, his employer was responsible, is responsible for the choice of the ultimate medical provider here. Yes. What the cure obligation is, how far does it extend? Right? Correct. Correct, Your Honor. And that's why I think with the, his inability to communicate, which is why I think that the other two cases, the Descentenot and the Central Gulf cases are instructive because in both of those cases, they involved foreign seamen in foreign ports. They didn't speak the language and they really had to rely on the ship owner who provided or took them to, for the care. I think that even in Descentenot had an ambulance been called and taken the Honduran worker to the California doctor in that case, the California doctor still gave the inadequate care. I think there still would have been some responsibility. I don't think there would have been a different result there. What damages, if we were to send this back, would be sought? Specifically, he has, he lost a significant amount of brain tissue as a result of the inadequate care and the lack of proper medication. So we're looking at pain and suffering and significant future loss, earning capacity because he is permanently and totally disabled. There is no work that this man can do and he was a captain. That's what we would be seeking. That's what we would have sought. And that goes beyond typical maintenance and cure. That is correct. I just wanted to be clear on that because of your exchange with Judge King. It's not that the immediate medical payments were not made. It's not that he wasn't paid maintenance. It's this long-term future issue of pain and suffering, lost capacity, those kinds of things. That is correct. This is strictly under the Jones Act. This is a Med-Mal case against Crosby-Tuggs. Well, not specifically because it's not the same level of the burden of proof and we're not Well, it's Med-Mal damages. I get that. Correct. And it's based on the malpractice. If the doctors did not commit malpractice, there would not be liability for Crosby-Tuggs. That's correct. At the end of the day, it's whether or not a jury would find, one, that the medical care provided by the physicians at either Ochsner or Tesch was negligent, and two, whether or not then Crosby has fulfilled its duty to provide prompt and adequate medical care. And I think there's an issue of fact as to whether a jury would say, listen, we think maybe they would agree and say, listen, calling 911 is adequate and that is that they have done what they needed to do. So what's your best case? What you're really saying is the cure obligation here extends to the choice of the ultimate medical provider and whatever happens when he gets there, right? No, Your Honor. This is completely, this is separate from the cure obligation. This is the obligation under the Jones Act to provide the prompt and adequate medical care, among many of the other obligations under the Jones Act to provide a safe place to work. So this is Jones Act liability, and your answer is that under the Jones Act, the employer is responsible for the negligence of the ultimate medical provider. Yes, Your Honor. Our position in this case, we're not looking for a bright line rule going forward at all times, but in this case we think that Crosby is vicariously responsible. Okay. But you know, when we write opinions, surprisingly, other people read them. And yes, it has the effect on other cases. So yes, you are asking us to expand the law. I understand that's what your client needs and you're doing what you need to do as a lawyer. I'm not criticizing that. But it's not as if, wow, this will be in some cave somewhere that nobody will know about. This will expand Jones Act liability, to me, to a very large extent. I'm not saying you're wrong. I'm just saying it's really pushing what are already very broad cases pretty broad. I think that it is not much of a push from DeSentineau to here, because we have a seaman who is unable to communicate and even be able to select the medical care that he is given. I think this is a very small step beyond that. And I think that it can be limited to situations where there is a life-threatening illness where a seaman cannot communicate. This isn't a situation I don't think that... So the problem to me is this business where I'm going to be in some port somewhere trying to find care for this seaman, the worse his injury, the more the duty on me, the guy on the vessel, okay, whoever is in charge on the vessel. And the timing is more urgent. If somebody is having a heart attack or somebody is in acute... If somebody just has a stubbed toe, I can spend some time researching the best stubbed toe doctor in Louisiana. But the emergency urgency is exactly why you call 911, exactly why you're trying to get him cured immediately, exactly why you want to get him in the arms of the doctor, so to speak, and not be yourself sitting around on your phone trying to find the good doctors in Louisiana. I understand that. I think with that urgency also comes a little bit of a higher standard because it is more significant than stubbing your toe on the boat, which is why I think that Crosby is responsible to make sure it's adequate.  Yes, ma'am. You're talking about it wasn't a stroke facility. You don't have to be a stroke facility to administer the medication timely, do you? No. I mean, that's just a normal thing they do in emergency places. Right. So you don't need any special... You just have to be able, I think, to perform a CT scan, which is what they did in that case. It was just an ARP and it was misread. Or else you can, if you don't have a, you can't perform the CT scan, you can ask a series of questions, but you can't get responses from this fellow, so you can't do that. That's correct. He doesn't have a response at that point. Okay. Thank you. Thank you. Good morning, Your Honors. May it please the Court, my name is Josh Lee. I represent the defendant appellee, Crosby Tuggs. Just to clarify that we are all on the same page, what we are here about this morning is very much a negligence case, not a maintenance and cure case. It's a question not of whether or not Crosby fulfilled the obligation to pay for medical treatment. It's a question of whether Crosby has any liability, whether Crosby was negligent in any way in connection with that. So it's all Jones Act negligence based on, essentially, failure to provide adequate medical care and vicarious liability, if you will, for the doctors who messed up, allegedly messed up. And I know you think they didn't, but let's assume arguendo for the moment that they did. No, Judge Haynes, I think you've gotten directly to the heart of the matter. It was laid out, I think, in both parties' briefs and in Judge Fallon's opinion, there really are four ways that a Jones Act employer can be liable in negligence to the seaman in connection with medical treatment. Fail to provide any medical treatment at all, we know that didn't happen here because an ambulance was called almost immediately. Fail to provide prompt medical attention, and again, we know that was not the case here. Negligence in the selection of the physician, and I'd submit to you that that did not happen here either. All Crosby did was call 911. Again, I think faced with, as members of the panel have suggested this morning, if someone in the gallery suddenly were nonresponsive and lying on the floor, I think the first reaction all of us would have, any reasonable person would have, would be to pick up the phone and call 911 and get an ambulance here so that medical professionals could figure out what was wrong with that person. Right, but then you get to pick. I'm sorry, Your Honor? You get to pick where the ambulance goes. Your Honor, in this case I'm not sure that you get to pick. In many cases you pick where the ambulance goes, and so you don't always go to the closest place. They'll give you options of close places. Certainly, Judge. So they didn't assume any responsibility in the record for where the ambulance was going to go, did they? They being Crosby? Yes. No, Your Honor, I don't believe that. They didn't ask any follow-up question, where are you taking him, that's not in the record, right? Your Honor, I don't believe there's any evidence of that in the record. Okay. I think that if they had, I'm sorry, Judge. I was just going to ask what the record shows about Amelia, Louisiana. I mean, if I collapsed in Houston, there's a lot of hospitals in Houston, I assume, and so probably there is a choice that two miles away there's X and two and a half miles away there's Y and so on. But if I collapse in, you know, the middle of nowhere, probably nobody asks where they're going to take me because they'd have to take me to the closest place, which is 30 miles away. Tell me about Amelia, Louisiana and how far that is from anything and how many choices you have. Is it more like Houston or is it more like the middle of nowhere? Judge, I don't know that there's any evidence in the record. There's nothing in the record one way or the other whether there were other options, right? That's correct, Your Honor. Okay. Just for the court's edification, Amelia is across a small bayou from Morgan City. That's how – Tesh Regional Medical Center, I think, is the largest hospital probably between New Orleans and Lafayette as you go along Highway 90 if you're trying to avoid I-10. And it would have been their burden on summary judgment since they have the ultimate burden of proof at trial to show that, hey, there were options that would have been better. Judge, I think that's correct. And indeed, in this case, there was a consult between the physicians at Tesh Regional Medical Center and the physicians at Ochsner where Mr. Randall ultimately was taken as to what exactly the appropriate protocol was. And, Judge Haynes, I believe it was you who pointed out on questioning earlier that there was disagreement among the physicians, even at that point, because of what the CT scan showed. And, again, I lack medical knowledge to the same extent as the members of the panel. Well, actually, we have members of the panel who have a lot of medical knowledge, but I'm just not one of them, that's all. Well, you know, I think I certainly would be lucky to be able to diagnose whether someone was experiencing a stroke, but then I learned certainly more through this case than I did know about it before the different types of stroke and the hazards that one faces as a medical professional in, well, if I treat this type of stroke. I feel relatively comfortable that had Crosby-Tuggs inserted itself and said, we've decided that he has this and you should give him this treatment, it would all, you know what, would have broken loose. So I feel sure that that's probably a violation of the law for one thing, for somebody to come in and start, you know, the captain of the ship or the whoever, to come in and start being the medical doctor. The question here really is whether you're going to almost have absolute liability or some form of strict liability for vessels when you're talking about a seaman needing emergency care. I mean, I think that's really where this is going. And given the breadth of care for seamen that is so rooted in history, why wouldn't we just do that and say, you know, you are just responsible for this person, whatever the situation? Well, Your Honor, the reason I would offer you to not do that is twofold. Number one, that would take the liability out of where it's always been in the field of Jones Act negligence and move it completely to, as you're suggesting, a field of either absolute liability or some species among seaworthiness, liability without fault. That's never been the nature of the Jones Act employer's obligation to provide medical treatment. It's always been based in negligence. Well, but then why is DeSentineau? What was the fault there? The default in DeSentineau was twofold. And it goes to the third and fourth ways that a Jones Act employer can be negligent in connection with medical treatment. The employer in DeSentineau selected the doctor. That's number three. And the doctor malpracticed by virtue of the improper selection. But there's no evidence in the record that it was an improper selection, that Dr. Turner was somehow substandard or that anyone would know. There's nothing in DeSentineau that says that that doctor so why isn't that analogous to calling 911? You're putting the person into the stream of the medical system. I'm not sure that this case is about a gross expansion of liability. I don't know how this case is all that different from DeSentineau where they went to a local doctor. It's not a company doctor. And so calling 911 is putting it into the medical system just as saying you can see in town Dr. Turner if you want. And there's nothing about Dr. Turner that's in the record that shows that Dr. Turner is not a board certified something or other and they should have made a better choice. Well, and Your Honor, I may be confusing DeSentineau with Sambula. I think Sambula there was some evidence of malpractice. DeSentineau. Well, there is malpractice. The doctor fails to diagnose the diabetes in DeSentineau. There is an allegation of malpractice. So how is that different than this case? The person went to Dr. Turner instead of 911. How is that different than this case? I think it's different in two important ways. First, when the employer in DeSentineau selected Dr. Turner, and this comes in by virtue not of the Jones Act, but by virtue of the Jones Act's incorporation of FELA, that doctor became the agent of DeSentineau's employer. And when the doctor became the agent of the employer, the employer became answerable and under respondeat superior principles for what the doctor did or did not do. Well, when you called 911, why didn't the 911 person similarly become the agent? Just like the doctor became, they selected the medical care by calling 911 the same way that you select the medical care otherwise. You're picking how to get into the stream of medical care. Judge Eller, I would say that, and I borrow, I sort of crib from the Fourth Circuit in the Dyes case, that I think if you say that by calling 911, whoever responds to the medical emergency becomes the agent of the employer, that's essentially the same as saying that every medical provider in the phone book is, as a matter of law, the agent of the employer when the vessel happens to be in that locality. Maybe not. I'm sorry, Judge? Keep going. No, the other important thing. I mean, the problem to me is the question of kind of the dividing line. What worries me a little bit about this is all of the prior cases did involve varying degrees of selection of the provider. Here you call 911, which is kind of what we're all taught and now our nieces and nephews and kids and whatever are all taught at age three, call 911. Now we're saying that's not good enough. And what worries me a little bit about that is now we're going to start encouraging these ship owners and vessel, you know, whoever is in charge, the captain or whoever, to start interjecting themselves into the medical treatment of these seamen in a way that itself could be damaging, much less when somebody refuses care on the part of another person. And the fact is if you show up and it's your husband or it's your father or whoever and you don't have a medical power of attorney, your rights are very limited in how much you can restrict their care. And that's your own relative. So this is, to me, getting very far afield. On the other hand, as Judge Alright pointed out, DeSentineau is pretty broad. So are we really making it all that much broader if we go, well, 911, picking the doctor, all the same thing? I think we are making it broader if we do that, Your Honors. And that brings it back to another important distinguishing characteristic of the DeSentineau case, and it's one that DeSentineau shares with Sambula. In both of those cases, there was a medical emergency of some sort. A doctor was called. A doctor provided some sort of treatment. Then the seaman was delivered back into the hands of his employer. He went back aboard the vessel, and his employer sat there and watched his condition get worse and didn't do anything about it, didn't call in a specialist, didn't seek further treatment. And in the case of DeSentineau, the gentleman died. In the case of Sambula, he ended up losing his eye. But that's an important, I think, distinguishing fact that's not present in this case. But those are not the facts in determining the negligence in those cases. Neither of those cases, they determine the negligence at the part where the negligent medical treatment took place. And in Sambula, they didn't actually select Dr. Lee. They just took him to the closest hospital. How is that different than calling 911? That seems to be very similar to calling 911. They arranged for him to be taken to the nearest hospital. That's what 911 ordinarily does unless you do make inquiries and unless they have a special contract with the ambulance company that comes in. What were you going to say? Your Honor, I'm not sure that's what 911 does, and I don't mean to argue that point with you. There's just no evidence on the record one way or the other on that. They took him to the closest hospital. So can you answer my question? How does that differ in Sambula? The negligence was the fact that the doctor at the closest hospital was not a good ophthalmologist and made poor ophthalmology decisions. But that was the closest hospital that he was transported to by the workers. Well, if memory serves, Judge Elrod, I believe in Sambula, the vessel owner was criticized for going to just the first available hospital as opposed to other available specialists that were in the area. And there was a good bit of flowery language in the opinion about the fact that the ship would not have had to sail around the Cape of Good Hope in order to reach alternative medical providers. And this record doesn't contain anything to show us that the people in the 911 ambulance are themselves, while not doctors, they are people with medical training. That's what they are. They're first responders. They're people that can administer CPR, so on and so forth. So they're supposed to know where to take the person, right? Your Honor, they're certainly more qualified. And they're more familiar with the local hospitals. And if there's five of them and one of them's a stroke center and one of them, versus there's nobody else around for 100 miles and this guy is unresponsive, we need to get him to the closest place. They're trained in that regard. Or at a minimum, this record doesn't refute that general proposition that we understand about 911. Your Honor, you're correct. And I think it was discussed earlier that there were some comments made, or I believe certainly the Acadian medical records reflected that there was discussion among the EMTs as to what had happened being a stroke. And they took him to Tash Regional Medical Center. And, again, Tash Regional, through a telemedicine procedure, consulted with doctors at Ochsner who have stroke training. So everything was very much interconnected. Ochsner in New Orleans? Yes, Your Honor. I believe that's correct. And, again, to go back to the Sentinel, or I'm sorry, I keep getting lost between the Sentinel and Sambula. You're in Sambula now? Sambula, the injury there was a very obvious one. To get back to the example of which are we amputating the wrong leg, that gentleman had an eye injury. And it was fairly obvious, well, injured eye, that might prompt one to go to an eye specialist. Here we had a non-responsive seaman. And I think it's easy for us all in hindsight to look and say, well, that sounds like that probably was a stroke. But certainly no one aboard the vessel at that time had any idea. And certainly no one had any idea when 911 was called. It wasn't until the EMTs arrived that any possibility existed for there being a diagnosis made. And those EMTs who, again, it's undisputed, were not the agents of Crosby, were not selected specifically by Crosby, and had no employment relationship with Crosby, they took him in the exercise of their medical judgment to what they thought was the most appropriate facility. And fortunately, knock wood, I've not been hospitalized that many times and haven't had the misfortune to have to go to Tash Regional Medical Center. I have no idea how large a facility is, but it's not as though they brought him to the dock in the box on the corner. Well, does the record, I guess, does the record show us, is there evidence of a better place he could have been taken within the time frame necessary, given the exigent circumstances that, you know, that we don't want to delay and drive him all the way to, you know, Dallas or New Orleans or wherever? Your Honor, I don't believe it does. Okay. And so isn't that their burden? And even on summary judgment, it's their burden because it's their burden of proof at trial to raise a fact issue that would show, hey, right next door was Stroke USA that was terrific and had nationally known doctors or whatever, and you ignored it and took it here, and by calling 911 you put him in this position. There's nothing like that here. That is not in the record. Correct, Your Honor. And again, I hate to keep banging this drum, but I think in order to get that far in the inquiry, there would have to be some, there would have to be either evidence in the record of which there is none or a legal conclusion as a matter of law by this Court that. That whatever happens happens is your fault. That when you call 911. You're strictly liable. Your Honor, I would submit to you that if we say that just calling 911 renders you liable for anything that happens thereafter, then it's a short hop, skip, and a jump to you're liable for any sort of medical treatment that's improper that a seaman receives at any time. I would say even if the seaman himself selects the doctor. Yeah, although we have cases that say no on that. Let me just ask one question. Yes, Judge. If this seaman is unconscious or not able, maybe not able to communicate, is your position that the obligation of the ship owner ends with 911? I mean, do they, if this seaman can't talk, can't deal with his situation, does the ship owner have an obligation to send someone along to make sure that this man gets an adequate doctor after the 911 call, after the ambulance? Judge King, I'm not aware of anything in the cases that suggest they would have such an obligation. And even if there were, I would question, particularly in the facts of this case, what good that would do, if any. Again, you'd have, I think, a captain or, you know, luckily in this case we were in port. Maybe we can get a company safety man to come along.  He gets to the hospital. And the doctors say, well, we think it may be a stroke or we think it may be a brain mass. Safety guy, what should we do? So your answer is that the obligation of the ship owner ends when they call 911. Your Honor, I would say that under the facts of this case. I certainly would not say that's a bright line rule. I think obviously if on the morning in question Crosby calls 911, sits there, gets ready, waiting for the ambulance, and it never shows up, obviously… Well, I'm assuming that he gets in the ambulance. Yes. But your answer is once he's off the ship and in the ambulance, we're done. From the standpoint of any obligation to look after the seaman. Well, Your Honor, certainly I would say that that would apply within the three-hour window we're talking about here. And I think that's the crucial time. Well, also that's a little bit separate from continuing to care for him. For example, if they'd sent him back and he'd collapsed again and all of this kind of ensuing need for care versus what caused the harm here and what are they trying to hold him accountable for. They're trying to hold him accountable for the doctors at the place 911 took him to. And so that's really the question. I have a quick question that we haven't covered, which is we've talked a lot about Sambulo and DeSentineau. We're clearly bound by them. I'm not suggesting otherwise. Hobson. But I think… I was going to guess Hobson, Judge. I'm sorry. No. I'm going to ask a question. Let me ask it. Those are both pretty old cases. And the world has evolved. The medical world has evolved. We have telemedicine. 911, I think, has evolved substantially as a mechanism for aid. Does that factor into the decision of how far we extend those cases? Not do we follow them. Of course we follow them. But does the age of the case and the development in just how medicine, how things happen, how emergencies are handled, does that affect how much we want to expand that? You know, that's a good question. I'm not sure that it does. I think the more recent case out of the Fourth Circuit, the Dyes case, fits squarely within the rationale of DeSentineau, Sambulo, and Hobson. I don't think we want to get into, as you were alluding, Judge Haynes,  the guys on the boat pulling out their pocket computers and saying, all right, WebMD, here are the symptoms, what's wrong with the captain, and who should I call to take care of him? Have I answered your question, Judge? If we were to say that you still have a duty to, you know, send a guy along or whatever, but you're not, you, the Crosby, are not liable for the wrongdoing of the 911 chosen hospital doctor, would there be a difference in the outcome here? In other words, if you did have an obligation to send somebody in the ambulance, which you all didn't, is there any evidence that sending the guy in the ambulance would have made any difference to the outcome? Your Honor, I don't think it would have, and it's for the reasons that we've discussed ad nauseum here. I don't think that there's anything that the company safety man or the mate going along to hold Captain Randall's hand could have really contributed from an intelligent, informed medical standpoint to be able to say, well, yes, we agree or disagree with this course of treatment, or no, we think we should go to some other hospital entirely because we've decided you are incompetent. Counsel, can you answer if, in response to the questions Judge King had for you, she was asking about whether or not you have this continuing duty to keep monitoring what's going on and not to just drop them off and say, okay, we'll catch you later when you get out of the hospital. In DICE, they specifically sent somebody along for that purpose, to monitor to make sure at each step that it was happening. If that's not a duty, why would they spend all that money and time to handhold through the entire process to make sure everything was happening appropriately? Judge, I haven't seen anything indicate that sending someone along in the ambulance is a specific duty of the employer. Again, in a case such as this one, that perhaps would be a duty without a point. It would really serve no purpose if the... No, no, no. The DICE person got to the hospital and oversaw what was happening and making sure that everything was going right. And so if they're not giving the stroke medicine or whatever, just like they could say, hey, guys, you've got to get on this. We've got to get this taken care of. Or not, or just say, please do something. You know, they keep it going. If you've ever been in the emergency room where there's no one with you and you don't have somebody to advocate and keep going up to the desk and say, my person is really sick, they need help, that's a big difference about the timeliness of the treatment. And why would they have the time and expense of having a person overseeing their care? That's what it's described in the case as a person overseeing their care from the company. So I don't think it's just a useless function. Well, Your Honor, again, just looking at the facts of this case in particular, I think what we're talking about is a three-hour window of time, is what's been represented, I think, to us and to the Court, of if only someone else had been involved in this three-hour window of time, a different decision might have been made. Yeah, a crucial three-hour of time. On whether to administer this TPA treatment. But that someone else is a doctor, not the company rep. Judge, I think that's exactly correct. There's no one that I'm aware of employed in the Crosby family of companies that could have made that decision or contributed in any meaningful way to it. Okay, thank you. We have your answer to the question. Yes. Thank you. Your Honors, I'd like to just address a couple of the things that were brought up in Crosby's argument. And one of the things that I don't think really would make that much of a difference is, in dissent notes, there are four ways that an employer, you know, they say that an employer can be responsible or breach its duty to provide prompt and adequate medical care. That last factor is by the negligence of the doctor that was selected by the employer. I'd posit that there have been questions of whether or not there was evidence of where else he could have been taken. Let's say that Mr. Randall was taken by Crosby to a neurologist. But that neurologist still, while perhaps qualified, still misdiagnosed the problem to a level of medical negligence. Had they dropped him off at that doctor, I think that under dissent note, there would still be vicarious liability for that misdiagnosis. I mean, the question is whether we're going to expand that rather broad liability a little more, or a lot more, depending on how you look at it, to the 911 call. But I want to ask about the exchange that we had towards the end of your opposing counsel's argument, which is this issue of sending the company rep along. Is it your position that the company rep would have been the guy to pick between the brain mass and the stroke when the doctor's the one fighting over it? No, Your Honor, I don't. So even if there is a duty to send the company rep, that's not the problem here? No, the problem is the misdiagnosis and having, at least having, and perhaps it would have, I don't know what would have changed if there had been a company rep sitting beside him, but he was at Tesh Regional Medical Center from 8.26 in the morning to 9.50. And they didn't put him in a waiting room, like when you take your loved one to the emergency room, you sit in the waiting room for hours. When an ambulance takes you, you go straight through to the medical... You go to the triage and then he was given... So he wasn't sitting in a waiting room, nobody knew he was there. No, that is not the case. Do you have anything else on rebuttal? No, I just wanted to bring up the issue about, I think that, regardless of where he was taken, if negligence occurred, I think there is vicarious liability. It's not strict liability, I think it is... Why isn't that strict liability? Just saying, wherever he's taken, wherever he goes, if they screw up, if they're the best doctor in the country, but they screw up, it's on you. I think that's a vicarious liability that was set forth into Sentinel by those four factors. Because they're an agent. They become the agent as a matter of law. Is that why? Yes, Your Honor. Thank you to have your argument.